**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

**Cometa Energia, S.A. de C.V., /o/b/o., Energia Azteca X, S. de R.L. de C.V.,**

**Petitioner,**

**v.**

**Federal Energy Regulatory Commission,**

**Respondent.**

**Case No. 24-1349**

## PETITION FOR REVIEW

Pursuant to 16 U.S.C. § 825*l*(b), Federal Rule of Appellate Procedure 15(a), and D.C. Circuit Rule 15, Cometa Energia, S.A. de C.V., ("Saavi"), hereby petitions the Court for review of the following orders issued by the Federal Energy Regulatory Commission (the "Commission"):

1. *Cometa Energia, S.A. de C.V. v. California Independent System Operator Corporation*, Docket No. EL24-92-000, "Order Denying Complaint," 187 FERC ¶ 61,193 (June 27, 2024) ("Initial Order"); and

2. *Cometa Energia, S.A. de C.V. v. California Independent System Operator Corporation*, Docket No. EL24-92-000, "Notice of Denial of Rehearing by Operation of Law and Providing for Further

Consideration," 188 FERC ¶ 62,104 (August 29, 2024) ("Rehearing Order").

On March 20, 2024, Saavi filed a complaint with the Commission pursuant to Sections 206, 306, and 309 of the Federal Power Act ("FPA") in response to notice from the California Independent System Operator Corporation ("CAISO") that the full capacity deliverability status ("FCDS") of La Rosita, one of the generating facilities owned by Saavi, had been terminated. Saavi and CAISO each filed several answers.

On June 27, 2024, the Commission issued the Initial Order, denying Saavi's complaint. Saavi subsequently sought rehearing on July 29, 2024. On August 29, 2024, the Commission issued the Rehearing Order, which does not address the substance of Saavi's request for rehearing, but deems the request denied pursuant to 16 U.S.C. § 825*l*(a) and this Court's decision in *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (*en banc*).

Saavi hereby petitions this Court for review of the Initial Order and the Rehearing Order, including on the grounds that the Commission's orders (1) violate the FPA and the Administrative Procedure Act and (2) are arbitrary and capricious, an abuse of discretion, not supported by substantial evidence, and otherwise contrary to law.

Because Saavi's July 29, 2024 request for rehearing is deemed to have been denied on August 29, 2024, this petition for review is timely. Venue is proper under 16 U.S.C. § 825*l*(b). Copies of the challenged orders are attached as Attachments A and B.

Saavi respectfully requests that the Court hold unlawful, vacate, and set aside the Commission's orders and grant such further relief as may be appropriate.

Respectfully submitted,

/s/ *Erin E. Dexter*
Erin E. Dexter
Milbank LLP
1850 K Street, NW, Suite 1100
Washington, D.C. 20006
EDexter@milbank.com

*Counsel for Saavi*

October 28, 2024

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| **Cometa Energia, S.A. de C.V., /o/b/o., Energia Azteca X, S. de R.L. de C.V.,**<br><br>**Petitioner,**<br><br>**v.**<br><br>**Federal Energy Regulatory Commission,**<br><br>**Respondent.** | **Case No. 24-1349** |

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Cometa Energia, S.A. de C.V. ("Saavi") states as follows:

Saavi is Mexico's largest independent private power generator, serving the Mexican power market and specified markets in California. Saavi is wholly owned by entities managed by Global Infrastructure Partners ("GIP"). GIP is wholly owned by BlackRock, Inc., which is a publicly held corporation.

Respectfully submitted,

/s/ *Erin E. Dexter*
Erin E. Dexter
Milbank LLP
1850 K Street, NW, Suite 1100
Washington, D.C. 20006
EDexter@milbank.com

*Counsel for Saavi*

October 28, 2024

# CERTIFICATE OF SERVICE

Pursuant to F.R.A.P. 15(c) and 25(d), I hereby certify that I caused the foregoing Petition for Review to be served upon the Secretary of the Federal Energy Regulatory Commission and the Office of the Solicitor of the Federal Energy Regulatory Commission at the following addresses:

Ms. Debbie-Ann A. Reese, Secretary
Federal Energy Regulatory Commission
888 First St., NE
Washington, D.C. 20426

Robert H. Solomon, Solicitor
Federal Energy Regulatory Commission
888 First St., NE
Washington, D.C. 20426

Pursuant to 18 C.F.R. § 385.2012 and 28 U.S.C. § 2112(a), I further certify that a date-stamped copy of this petition will be mailed to the Office of the Secretary at the above-stated address.

Pursuant to F.R.A.P. 15(c), I further certify that I caused the foregoing document to be served by mail on the parties on the Commission's service list for Docket No. EL24-92, which is attached hereto.

/s/ *Erin E. Dexter*
Erin E. Dexter

October 28, 2024

Service List

| Sara Novosel<br>Calpine Corporation<br>717 Texas Avenue, Suite 1000<br>Houston, TX 77002 | Rachael Marsh<br>Calpine Corporation<br>717 Texas Avenue, Suite 1000<br>Houston, TX 77002 | Mark Smith<br>Calpine Corporation<br>3003 Oak Road, Suite 400<br>Walnut Creek, CA 94597 |
|---|---|---|
| Jeffrey Bayne<br>Spiegel & McDiarmid LLP<br>1818 N Street, NW<br>8th Floor<br>Washington, D.C. 20036 | Lisa Dowden<br>Spiegel & McDiarmid LLP<br>1818 N Street, NW<br>8th Floor<br>Washington, D.C. 20036 | Amanda Drennen<br>Spiegel & McDiarmid LLP<br>1818 N Street, NW<br>8th Floor<br>Washington, D.C. 20036 |
| Samuel Whillans<br>Spiegel & McDiarmid LLP<br>1818 N Street, NW<br>8th Floor<br>Washington, D.C. 20036 | Randy Howard<br>NCPA<br>651 Commerce Drive<br>Roseville, CA 95678 | William Weaver<br>California ISO<br>P.O. Box 639014<br>Folsom, CA 95630 |
| Michael Kunselman<br>Davis Wright Tremaine LLP<br>1301 K Street NW, Suite 500<br>East<br>Washington, D.C. 20005 | Jonathan Trotta<br>Davis Wright Tremaine LLP<br>1301 K Street NW, Ste. 500<br>East<br>Washington, D.C. 20005 | |

# Attachment A

187 FERC ¶ 61,193
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Willie L. Phillips, Chairman;
Allison Clements and Mark C. Christie.

Cometa Energia, S.A. de C.V., /o/b/o., Energia Azteca X, S. de R.L. de C.V.
v.
California Independent System Operator Corporation

Docket No. EL24-92-000

ORDER DENYING COMPLAINT

(Issued June 27, 2024)

1. On March 20, 2024, Cometa Energia, S.A. de C.V. (Saavi)[1] filed, pursuant to sections 206, 306, and 309 of the Federal Power Act (FPA)[2] and section 206 of the Commission's Rules of Practice and Procedure,[3] a complaint against the California Independent System Operator Corporation (CAISO).[4] The complaint alleges that CAISO unlawfully terminated Saavi's full capacity deliverability[5] status associated with the Saavi combustion turbine Unit C generator (Unit C), an operating 181.5 MW generation resource with interconnection rights to the CAISO controlled grid. In this order, we deny Saavi's complaint.

[1] Cometa, Saavi, and Energia Azteca X, S. de R.L. de C.V. (EAX) are known as portfolio companies of the Saavi conglomerate of energy companies. For ease of reference throughout this order, we refer to the Complainant collectively as "Saavi."

[2] 16 U.S.C. §§ 824e, 825e, 825h.

[3] 18 C.F.R. § 385.206 (2023).

[4] On March 21, 2024, Saavi submitted a supplemental filing to include the required Certificate of Service that was inadvertently omitted from the March 20, 2024 complaint filing.

[5] "Deliverability" is the "annual Net Qualifying Capacity of a Generating Facility, as verified through a Deliverability Assessment and measured in MW, which specifies the amount of resource adequacy capacity the Generating Facility is eligible to provide." CAISO, CAISO eTariff, app. A (Definitions) (0.0.0) (defining Deliverability).

## I. Background

2. Saavi states that, since July 18, 2003, it has operated Unit C under a Commission-approved Non-Conforming Participating Generator Agreement with CAISO (PGA). Saavi states that, under the PGA, Saavi has the contractual right to be dispatched in CAISO or in the Comisión Federal de Electricidad (CFE) in Mexico, through defined processes that accommodate Unit C's ability to switch its generation dispatch. Saavi explains that these non-conforming terms were negotiated to accommodate legal and jurisdictional issues, as well as electrical configuration issues, which are unique to Unit C's situation as a generator normally connected to and serving the CAISO grid, but that is physically located in Mexico. Saavi states that, as relevant here, the PGA includes the right for Saavi to temporarily disconnect from CAISO under pre-defined procedures and subsequently return to CAISO service.[6]

3. Saavi states that, in 2017, after providing the required contractual notice to CAISO that it would be temporarily disconnecting Unit C from the CAISO grid, it connected Unit C to CFE to address reliability issues. According to Saavi, it has been in contact with CAISO since that time through semiannual notices updating CAISO on Unit C's interconnection status and extending its disconnection from the CAISO grid. Saavi states that CAISO has expressly approved each extension of Unit C's disconnection since 2017. Saavi explains that the extension approval letters provided by CAISO stated that CAISO would "permit the continued disconnection and future reconnection of [Unit C]," while noting that "during the time period it is connected to CFE, the [Unit C] will no longer be available or eligible to meet Resource Adequacy requirements in the ISO Balancing Authority Area."[7] Saavi contends that, at no point during Unit C's connection to CFE from 2017 to 2022 did CAISO indicate that Unit C was at risk of permanently losing its deliverability status.[8]

4. Saavi explains that, since early 2022, it has been in the process of developing a battery electric storage system (BESS) that will be connected to the CAISO grid using the same Saavi-owned Baja California 230 kV transmission line that connects Unit C to the CAISO grid. Saavi asserts that the BESS will act as replacement generation, as the BESS

[6] Complaint at 6 (citing Ex. I, CAISO Non-Conforming Agreement Transmittal Letter, Docket No. ER03-1090-000, at 3 (filed July 18, 2003)).

[7] *Id.* at 7 (quoting Ex. C, Letter from Dede Subakti, CAISO Director of Operations Engineering Services, to Marco Ican de la Pax Fuentes, Saavi Legal Representative (Apr. 27, 2021)).

[8] *Id.*

will connect at the same bus at the IV Substation as Unit C.[9] Further, Saavi states that the BESS will provide up to 400 MW of power once all phases are complete, and that the first phase, which has been designed to provide 185 MW of power, will achieve commercial operation in the third quarter of 2027.[10]

5. Saavi states that, on October 20, 2022, which was over five years since Unit C connected to CFE under the procedures set forth in the PGA, it initiated discussions with CAISO concerning the development of the BESS. Saavi contends that it was through these discussions that Saavi first learned of CAISO's position that, while Unit C retains its interconnection service capacity rights, it had lost its full capacity deliverability status. According to Saavi, it was informed by CAISO that, pursuant to section 6.1.3.4 of CAISO's Business Practice Manual (BPM) for Reliability Requirements, Unit C had "lost its deliverability as the resource has been disconnected from and has not been scheduled into the CAISO system nor operated at the capacity level associated with its rated deliverability for over three years which is required to retain such rights."[11]

6. Saavi asserts that it has repeatedly attempted to resolve this matter and has argued to CAISO that the termination of Unit C's deliverability status does not follow from section 6.1.3.4 of the BPM for Reliability Requirements. Saavi claims that, despite these efforts, CAISO continues to argue it was appropriate to revoke Unit C's deliverability status pursuant to that BPM section.[12]

## II. Complaint

7. Saavi argues that CAISO's termination of Unit C's full capacity deliverability status is unlawful under the FPA because it is inconsistent with the express procedures in the PGA that accommodate Unit C's unique situation as a grid-switching resource. Further, Saavi contends that CAISO's position is contrary to the plain language of the BPM section on which CAISO relied to terminate Unit C's deliverability status. Finally, Saavi asserts that CAISO's position on Unit C's deliverability status is contrary to

---

[9] *Id.* at 12.

[10] *Id.* at 7-8.

[11] *Id.* at 8 (quoting Ex. E, October 20, 2022 email from Chris Sibley, CAISO Senior Manager of Regulatory Contracts at 1).

[12] *Id.* at 8-9.

CAISO's own documented positions with respect to application of the BPM and is, therefore, unduly discriminatory.[13]

8. Saavi argues that it strictly followed the relevant procedures in notifying CAISO concerning Unit C's connection to CFE. Saavi states that it agrees with CAISO that section 4.1.1 of the PGA governs Unit C's disconnection and reconnection procedures and establishes the following obligations for Saavi to notify CAISO of impending disconnection and reconnection:

> The Participating Generator may disconnect [Unit C] from the CAISO Controlled Grid (and hence the CAISO Balancing Authority Area) only with two weeks prior written authorization by the CAISO, unless the CAISO authorizes a shorter notification period, or as otherwise authorized in this Agreement. The Participating Generator may connect [Unit C] to the CAISO Controlled Grid (and hence the CAISO Balancing Authority Area) only with two weeks prior written authorization by the CAISO, unless the CAISO authorizes a shorter notification period, or as otherwise authorized in this Agreement.[14]

Saavi avers that it far exceeded the PGA's notice requirements with respect to Unit C's CFE connection because it has regularly conferred with CAISO concerning Unit C's status while it has been in an extended period of CFE service, and CAISO has repeatedly and expressly approved Unit C's connection to CFE.[15]

9. In addition, Saavi contends that CAISO has misapplied the relevant BPM language by concluding that the temporary connection to CFE constitutes a valid basis for terminating Unit C's deliverability status. Saavi asserts that section 6.1.3.4 of the BPM for Reliability Requirements specifies that, in order to retain its deliverability status, a generating unit must operate or be capable of operating at the capacity level associated with its rated deliverability. Saavi adds that, under this section, a generating unit will lose its deliverability status if it becomes incapable of operating at the rated level for any consecutive three-year period. However, Saavi states that this BPM section also makes an exception for a holder of the deliverability priority to retain its rights after the expiration of the three-year period if it can demonstrate that it is actively engaged in

---

[13] *Id.* at 9.

[14] *Id.* (quoting PGA, at § 4.1.1 (attached as Ex. A to Complaint)).

[15] *Id.* at 10 (citing Ex. B, Testimony of Juan P. Jimeno, at 4).

the construction of replacement generation to be connected at the bus associated with the deliverability.[16]

10. According to Saavi, Unit C satisfies the BPM requirements for retaining its deliverability status because it has been operating at the capacity level associated with its rated deliverability,[17] and at no point has become incapable of operating at that level for any length of time. Saavi notes that, if it were aware that CAISO would interpret its connection to CFE as rendering Unit C "incapable of operating" under the BPM, it could have reconnected to CAISO to avoid triggering the three-year period under the BPM for losing deliverability rights. Thus, Saavi argues that its temporary disconnection from CAISO and connection to CFE cannot serve as grounds to terminate Unit C's full capacity deliverability status. Moreover, Saavi highlights that it has also made the demonstration to CAISO that it is actively engaged in the construction of replacement generation that will interconnect at the same bus as Unit C. Saavi contends that the appropriate response by CAISO would have been to engage in discussions with Saavi to establish milestones to preserve Unit C's deliverability status, rather than silently stripping Unit C of its deliverability and effectively depriving Saavi of any ability to preserve its status through a transfer of Unit C's status to the BESS.[18]

11. Saavi also argues that CAISO incorrectly relies on criteria applicable to retired or mothballed facilities to determine that the BESS is not relevant to retention of Unit C's deliverability rights. Saavi contends that the potential transfer of Unit C's rights is plainly contemplated in section 6.1.3.4 of the BPM for Reliability Requirements, which provides for interconnection customers to transfer deliverability rights to another investment. Further, Saavi asserts that Unit C meets the criteria of section 6.5.4 of the BPM for Generator Management, which provides guidance on interconnection customers' options for reallocating deliverability rights from one generating facility to

---

[16] *Id.* at 10-11 (citing BPM for Reliability Requirements, § 6.1.3.4 (Deliverability to Aggregate of Load) ("To the extent a Generating Unit becomes incapable of operating at this level for any consecutive three-year period, the Generating Unit will lose its deliverability priority and interconnection service in an amount reflecting the loss of generating capability. The holder of the deliverability priority and interconnection service may retain its rights after the expiration of the three-year period if it can demonstrate that it is actively engaged in the construction of replacement generation to be connected at the bus associated with the deliverability priority. Under such circumstances, the Generating Unit developer and ISO will identify specific milestones to preserve the deliverability priority.")).

[17] *Id.* at 11 (citing Ex. J, CENACE Energy Sale Statement).

[18] *Id.* at 11-12.

another.[19] Saavi also claims that the proposed transfer is consistent with section 13.1.1 of the BPM for Generator Management, which provides guidance regarding a change in fuel source in connection to the generator repowering process. According to Saavi, instead of relying on these clearly applicable criteria, CAISO instead cites section 12 of the BPM for Generator Management, which governs retired and mothballed facilities, as its basis for not recognizing potential options to transfer Unit C's deliverability. Saavi maintains that this BPM section is inapposite, as Unit C is neither retired nor mothballed.[20]

12. Finally, Saavi argues that CAISO's actions are unduly discriminatory because CAISO's position in this case is contrary to its prior positions regarding section 6.1.3.4 of the BPM for Reliability Requirements. Saavi asserts that, in a prior case, CAISO argued that the three-year period for terminating deliverability status did not begin until the generator provided notice to CAISO that it intended to permanently retire the generator. Further, Saavi claims that CAISO took the position in that case that a generator simply alerting CAISO of its intent to replace retired generation within three years of its retirement is sufficient to prevent CAISO from reallocating delivery rights. Saavi highlights that, in this situation, Saavi never intended, or conveyed an intent, to retire Unit C, and Unit C has continued to operate at the required capacity level during its CAISO-approved temporary connection to CFE. Saavi also emphasizes that it has conveyed to CAISO its intent to transfer the deliverability rights at issue to another generation facility to be connected at the same bus as Unit C. Thus, Saavi argues that according to CAISO's own rationale, Saavi could not have silently forfeited Unit C's deliverability while it was connected to CFE.[21]

13. Saavi contends that, to the extent CAISO seeks to deprive generators of their deliverability status for exercising contractual dispatch rights, any such procedures must be on file with the Commission under the rule of reason. According to Saavi, the rule of reason dictates that any rules that significantly affect rates, terms, and conditions of service and are readily susceptible to specification be on file with the Commission.[22] Saavi argues that CAISO's instant application of its BPM to Unit C represents the type of rule that requires filing at the Commission prior to being implemented because the

---

[19] CAISO, BPM for Generator Management, § 6.5.4 (Deliverability Transfer) ("An Interconnection Customer may reallocate its Generating Facility's Deliverability to another Generating Facility that has a point of interconnection at the same substation/switchyard at the same voltage level.").

[20] Complaint at 12-13.

[21] *Id.* at 13-14.

[22] *Id.* at 15 (citing *Energy Storage Ass'n v. PJM Interconnection, L.L.C.*, 162 FERC ¶ 61,206, at P 103 (2018)).

elimination, without notice, of an operating generator's deliverability status plainly and significantly affects critical terms and conditions of service.[23]

14. Saavi argues that, if left uncorrected, CAISO's revocation of Unit C's deliverability status would result in significant harm to Saavi. Namely, Saavi contends that such revocation would completely eliminate Unit C's ability to provide resource adequacy service to the CAISO grid and imperils Saavi's existing generation and transmission investments, as well as its current development of the BESS to which Unit C's deliverability rights could be transferred. Accordingly, Saavi requests that the Commission direct CAISO to restore Unit C's 181.5 MW of full capacity deliverability status and to clarify that Unit C has the same transferability rights available to all other interconnection customers located in the CAISO footprint.[24]

## III. Notice and Responsive Pleadings

15. Notice of the complaint was published in the *Federal Register*, 89 Fed. Reg. 21,511 (Mar. 28, 2024) with protests and interventions due on or before April 9, 2024. Calpine Corporation and the Northern California Power Agency filed timely motions to intervene. On April 9, 2024, CAISO filed an answer to the complaint. On April 24, 2024, Saavi filed an answer to CAISO's answer. On May 6, 2024, CAISO filed an answer to Saavi's answer. On May 21, 2024, Saavi filed an answer to CAISO's May 6, 2024 answer.

### A. CAISO April 9, 2024 Answer

16. CAISO urges the Commission to deny the complaint, arguing that Saavi's allegations are unsupported by the plain language and intent of the PGA, the CAISO Open Access Transmission Tariff (Tariff), and BPM for Reliability Requirements. Thus, CAISO contends that Saavi has failed to meet the burden of proof set forth under FPA section 206. Specifically, CAISO asserts that the PGA does not exempt Saavi from generally applicable Tariff and BPM requirements. CAISO acknowledges that section 4.1.1 of the PGA provides that Saavi can disconnect and reconnect Unit C from the CAISO grid upon prior written notice and authorization from CAISO, but highlights that PGA also specifies that Unit C "will be subject to the requirements of the CAISO Tariff at all times."[25]

---

[23] *Id.* at 16.

[24] *Id.* at 3, 17.

[25] CAISO April 9 Answer at 11 (citing PGA, § 4.2).

17. CAISO states that among these requirements is the obligation for Saavi, like all generating resources, to maintain an association with a scheduling coordinator certified by CAISO in order to operate in the CAISO markets. Moreover, CAISO states that the PGA specifically incorporates this requirement.[26] CAISO states that Unit C disconnected from the CAISO grid in 2017 and disassociated from its scheduling coordinator that July. CAISO asserts that, consistent with the Tariff, Unit C could no longer operate in the CAISO markets as of the time of the disassociation. CAISO states that, as of July 2020, Unit C was still disconnected and not associated with a scheduling coordinator and, therefore, still could not operate as a participating resource in the CAISO markets. Accordingly, CAISO argues, because Unit C could not operate in CAISO for that three-year period, and thus did not have deliverable output for a consecutive three-year period, Unit C lost its deliverability status in July 2020, consistent with section 40.4 of the Tariff and section 6.1.3.4 of the BPM for Reliability Requirements.[27]

18. CAISO argues that it is Saavi's responsibility to be aware of its obligations under the Tariff and BPMs and to remain compliant with the relevant provisions of both. CAISO therefore contends that Saavi should have known that when Unit C no longer had a scheduling coordinator as of July 2017, it could not operate in the CAISO markets, and should have reasonably known in July 2020, after three consecutive years of being unable to provide resource adequacy within CAISO, that Unit C would lose deliverability status. Further, CAISO notes that the annual net qualifying capacity reports posted publicly by CAISO beginning in 2019 also reflected such change in Unit C's status as a result of its inoperability within the CAISO system. CAISO asserts that, despite the availability of this information, Saavi made no effort to engage with CAISO to resolve these issues or otherwise demonstrate good standing in an effort to preserve Unit C's deliverability status. Thus, CAISO argues that holding Saavi harmless for its own inaction would violate both the filed rate doctrine and the FPA's prohibition on unduly preferential treatment.[28]

19. CAISO also contends that Saavi's argument that Unit C has remained "capable of operating" as a resource adequacy resource is inconsistent with the plain language of the BPM and defies its intent. CAISO asserts that the relevant provisions of the Tariff and the BPM for Reliability Requirements, as well as the overall resource adequacy

---

[26] *Id.* (citing PGA, Clause A ("The CAISO Tariff provides that the CAISO shall not accept Bids for Energy or Ancillary Services generated by any Generating Unit interconnected to the CAISO Controlled Grid . . . otherwise than through a Scheduling Coordinator.")).

[27] *Id.* at 11-12.

[28] *Id.* at 12-13.

framework, are designed to ensure reliability in the CAISO balancing authority area. CAISO explains that, under the Tariff, deliverability reflects a public policy objective of ensuring that load serving entities can meet their resource adequacy obligations. CAISO argues that Saavi's proffered interpretation of what it means to be "capable of operating" in a manner that permits a generator to retain its deliverability rights would undermine this objective. According to CAISO, a generator that has no scheduling coordinator, is electrically isolated from the CAISO grid, and is dispatching power to a different control area and country cannot, by definition, be "capable of operating" at the level associated with its CAISO deliverability rights. Thus, CAISO asserts that the Commission should reject Saavi's illogical and unreasonable reading of the Tariff and BPM for Reliability Requirements.[29]

20. In addition, CAISO contends that Saavi is mistaken to assume that the disconnect approval letters it received from CAISO exempt it from applicable Tariff or BPM requirements, or otherwise confer upon Unit C a right to retain full deliverability status. Rather, CAISO asserts that the disconnect extension approval letters merely reflect CAISO's confirmation of Saavi's election to disconnect Unit C from CAISO and to connect to CFE, consistent with protocols under the PGA.[30]

21. CAISO denies that its treatment of Saavi is inconsistent with its prior statements regarding deliverability limitations and other similarly situated generators. CAISO explains that, in the California Public Utilities Commission (CPUC) proceeding referenced by Saavi in the complaint,[31] CAISO stated that it would not revoke the deliverability for a recently retired generating unit until such time as the generator owner indicates that it would not repower or until the three-year window set forth in section 6.1.3.4 of the BPM for Reliability Requirements closes. CAISO asserts that Saavi's reliance on the fact that Saavi never informed CAISO that it intended to retire Unit C is irrelevant because Saavi ignores the disjunctive nature of CAISO's statement. Specifically, CAISO explains that it was not committing to extending deliverability in perpetuity in the absence of a decision on repowering, but rather only during the three-year retention period specified in the BPM. Because it has been over six years since Saavi disconnected from the CAISO grid and disassociated from its scheduling

---

[29] *Id.* at 3-5, 13-15.

[30] *Id.* at 15-16.

[31] Complaint at 13-14 (citing Comments of CAISO on the Proposed Decision Dismissing Application Without Prejudice, In the Matter of the Application of Southern California Edison Company (U338E) for a Certificate of Public Convenience and Necessity for the Coolwater-Lugo Transmission Project, Docket No. 13-08-023, at 1 (filed May 11, 2015)).

coordinator, CAISO contends that its prior statements support, rather than contradict, its position with respect to Unit C. Moreover, CAISO notes that it has applied the three-year limitation to other generators when they have been ineligible to participate in the CAISO markets for more than three years and, therefore, denies its treatment of Saavi is unduly discriminatory.[32]

22. CAISO also contends that, even if Unit C retained its deliverability, it would be ineligible to transfer such deliverability to the planned BESS. CAISO notes that Saavi correctly cites 6.5.4 of the BPM for Generator Management for an explanation of the generally applicable transfer criteria, but CAISO argues that neither these criteria nor the transfer rights under section 8.9.9 of CAISO's Generator Interconnection and Deliverability Allocation Procedures (GIDAP) apply to Saavi because Saavi is not an interconnection customer subject to the GIDAP. Rather, CAISO highlights that Saavi has a non-conforming PGA with CAISO and, therefore, its rights are limited as a participating generator with a unique arrangement.[33] Moreover, CAISO contends that deliverability may only be retained beyond the three-year period if a generator notifies CAISO within the three-year period that it is actively engaged in the construction of replacement generation to be connected at the bus associated with the deliverability. CAISO states that, in this case, Saavi did not notify CAISO of the BESS until mid-2022, more than five years after Unit C was disconnected from the CAISO grid.[34]

23. CAISO argues that there is no basis for Saavi's claim that the rule of reason counsels that certain provisions of the BPM for Reliability Requirements must be on file with the Commission prior to being implemented. CAISO notes that the Commission has understood BPMs to be "guides for internal operating procedures and to inform market participants of the CAISO's practices,"[35] and has also recognized that implementation details and technical specifications need not be on file under the rule of reason.[36] CAISO asserts that section 40.4 of the Tariff makes sufficiently clear that deliverability is not immutable and can be reduced depending on annual deliverability studies performed by CAISO, as described in that same Tariff section, to assess the net qualifying capacity of

---

[32] CAISO April 9 Answer at 16-17 (citing attach. A, Declaration of Robert Sparks, at 2-4) (Sparks Declaration)).

[33] *Id.* at 22-23.

[34] *Id.*, Sparks Declaration at 2-4.

[35] *Id.* at 18 (quoting *Cal. Indep. Sys. Operator Corp.*, 119 FERC ¶ 61,313, at P 343 (2007)).

[36] *Id.* (citing *Hecate Energy Greene Cnty. 3 LLC v. Cent. Hudson Gas & Elec. Corp.*, 176 FERC ¶ 61,023, *order on reh'g*, 177 FERC ¶ 61,121, at P 46 (2021)).

generating units that are providing resource adequacy capacity. CAISO asserts that, given the principles and concepts included in the Tariff, the BPM for Reliability Requirements is the most appropriate venue for defining the methodologies and implementation details used to undertake and produce the deliverability assessment, including the three-year retention limit for units that are not operating or capable of operating at their rated deliverability.[37]

24. Further, CAISO argues that Saavi's request that the Commission direct CAISO to reinstate Unit C's deliverability status, and to initiate discussions with respect to the BESS milestones appropriate to retain Saavi's deliverability rights, is barred by the prohibition against retroactive ratemaking and general principles of equity and estoppel. CAISO again notes that Saavi should have reasonably known Unit C's status had changed when CAISO posted its annual net qualifying capacity reports every year since 2019. CAISO contends that Saavi fails to explain how or why it overlooked this change in status or why it permitted so much time to lapse before filing the complaint or otherwise asserting a claim in a timely manner. Moreover, CAISO explains that, in the four years since the 2020 resource adequacy year, it has allocated deliverability to numerous generators and has delisted numerous generators via its annual net qualifying capacity report. Thus, CAISO asserts that Saavi is mistaken in its claim that the Unit C's deliverability will be reallocated in its current allocation process. CAISO clarifies that Unit C's deliverability has already been irrevocably awarded to other nearby generators and cannot be reinstated to Unit C without de-allocating deliverability from other generators that are providing resource adequacy capacity. As a result, CAISO contends that granting Saavi's requested relief would run afoul of the prohibition against retroactive ratemaking because it would require CAISO to undo already completed reallocations of Unit C's deliverability.[38]

25. CAISO argues that, for similar reasons, the Commission should deny Saavi's requested relief on equitable grounds. CAISO again emphasizes that restoring Unit C's deliverability could only be accomplished by removing deliverability from generators that are already included in resource adequacy portfolios and providing resource adequacy capacity. CAISO asserts that compelling such a result would be inequitable to affected generators as well as ratepayers responsible for network upgrades to enable deliverability from such generators. CAISO contends that the inequity of Saavi's requested relief is underscored by Saavi's own representations that its interest in restoring Unit C's deliverability is not to provide resource adequacy from Unit C for the benefit of

[37] *Id.* at 17-19.

[38] *Id.* at 19-21. CAISO notes that if it were to restore the 181 MW of deliverability to Unit C, approximately 40 generating units would be impacted by net qualifying capacity reductions. *Id.*, Sparks Declaration at 5-6.

ratepayers, but to preserve that deliverability for transfer to a future BESS. CAISO argues that these same equitable considerations recommend in favor of the Commission rejecting Saavi's request to direct CAISO to initiate discussions with respect to BESS milestones for the purpose of retaining Saavi's deliverability rights.[39]

**B. Saavi April 24, 2024 Answer**

26. Saavi disputes CAISO's claim that Saavi failed to make the requisite effort to maintain Unit C's deliverability status. Saavi argues that, by providing notice of Unit C's status every six months, it did more than required under the Tariff or any other applicable agreement. Saavi notes that, even after the purported three-year timeline for expiration of deliverability, CAISO continued to acknowledge Saavi's notice, in writing, including a caution that Unit C would be ineligible to provide resource adequacy during the period of disconnection. Saavi asserts that caution concerning the provision of resource adequacy would have been meaningless if Unit C's deliverability had been revoked. Thus, Saavi contends that it was reasonable to believe that Unit C's deliverability status was preserved.[40]

27. Saavi also argues that CAISO's arguments regarding the BPM for Reliability Requirements are inapposite. Saavi highlights that both CAISO's original Large Generator Interconnection Agreement (LGIA) entered into between Saavi's predecessor and CAISO and the PGA predated the BPM for Reliability Requirements, and neither agreement contemplates the three-year deliverability retention period at issue here. Saavi asserts that it should not be compelled to comply with requirements that (1) were not set forth in either the PGA or LGIA, or the Tariff; (2) were not properly applied by CAISO; and (3) violate the Commission's rule of reason policy. As such, Saavi argues that the Commission should disregard CAISO's reliance on the BPM as a basis for terminating Unit C's deliverability status.[41]

28. Saavi reiterates its prior position that section 6.1.3.4 of the BPM for Reliability Requirements should have been on file with the Commission, pursuant to the Commission's rule of reason policy. Saavi asserts that the precedent cited by CAISO in its answer that discusses the "infinitude of practices affecting rates and services"[42] does not justify CAISO's failure to file with the Commission the process used to terminate a generator's deliverability status. According to Saavi, CAISO has not explained how this

[39] *Id.* at 21-22.

[40] Saavi April 24 Answer at 3-4.

[41] *Id.* at 4-5.

[42] CAISO April 9 Answer at 18.

process would not constitute a process "readily susceptible of specification" and "significantly affect[s] rates, terms, and conditions of service."[43]

29. Further, Saavi notes that reductions in net qualifying capacity are explicitly included in the Tariff, and the BPM for Reliability Requirements also requires CAISO to provide notice of any net qualifying capacity to the affected generator 15 days prior to posting the net qualifying capacity report that documents the change.[44] Saavi contends that CAISO failed to provide the required notice that Unit C's net qualifying capacity was being reduced. Moreover, Saavi argues that CAISO removed Unit C from the net qualifying capacity for the 2019 resource adequacy year despite the fact that Unit C was not disconnected from the CAISO grid until 2017. Thus, Saavi contends that CAISO could not be relying on the three-year retention period set forth in section 6.1.3.4 of the BPM for Reliability Requirements.[45]

30. Saavi also questions CAISO's scheduling coordinator argument. Saavi recognizes that section 40 of the Tariff makes reference to the requirement of associating with a scheduling coordinator in order to provide electricity to the CAISO grid, but argues that the Tariff makes no mention that disassociation with the scheduling coordinator would trigger a termination of deliverability status. Saavi again insists that the relevant deliverability language in the BPM for Reliability Requirements refers clearly to a generating unit's physical capability to operate, and not an administrative requirement. Saavi asserts that no Tariff provision supports CAISO's interpretation of the nexus between the scheduling coordinator requirement and loss of deliverability.[46]

31. Finally, Saavi denies that restoring Unit C's deliverability would unfairly prejudice other generators. Saavi argues that CAISO created this unjust and unreasonable situation and Saavi should not be made responsible for CAISO's actions merely because other generators would be affected. Saavi suggests that, as a solution, CAISO could provide interim deliverability allocations to the generators that would lose a small portion of their deliverability, which would be replaced with permanent deliverability in subsequent deliverability allocation rounds. Further, Saavi contends that

---

[43] Saavi April 24 Answer at 5-6 (quoting *Midcontinent Indep. Sys. Operator, Inc.*, 169 FERC ¶ 61,137, at P 252 (2019)).

[44] *Id.* at 6 (citing CAISO, CAISO eTariff, § 40.4.2 (Net Qualifying Capacity Report) (0.0.0); BPM for Reliability Requirements, § 6.1.2 (Changes to QC)).

[45] *Id.* at 7-8.

[46] *Id.* at 8-9.

deliverability is often bought and sold separately on the open market and, as such, may be available to generators and load serving entities on that basis.[47]

### C. CAISO May 6, 2024 Answer

32. CAISO asserts that Saavi's attempt to downplay how its requested remedy would harm other interconnection customers and load serving entities evinces Saavi's misunderstanding of how deliverability works. First, CAISO states that Saavi is mistaken about deliverability being bought and sold on the open market.[48] CAISO clarifies that deliverability is not an asset or property right that can be bought or sold and cannot be possessed by load serving entities. CAISO explains that deliverability is transmission capacity for a generating facility at a specific point of interconnection that is assigned to interconnection customers only. CAISO also notes that options for generating units to transfer deliverability are extremely limited. Thus, CAISO again emphasizes that, if the Commission orders CAISO to reinstate Unit C's deliverability, numerous affected generators will not be able to replace it, and the load serving entities relying on those generators for resource adequacy will have to find alternate sources of capacity to meet their resource adequacy obligations.[49]

33. Second, CAISO argues that Saavi appears to misunderstand the relationship between net qualifying capacity and deliverability when it suggests that CAISO could provide interim deliverability allocations to generators that would lose deliverability, which could be later replaced with a permanent deliverability allocation.[50] CAISO clarifies that the only way generators can lose full capacity deliverability status is if they failed to provide energy for three years; otherwise, they would only have their net qualifying capacity reduced, which would reduce their ability to provide resource adequacy capacity. CAISO contends that Saavi again confused these concepts in its allegation that CAISO failed to wait the required three years prior to terminating Unit C's deliverability status. CAISO explains that, while it immediately reduced Unit C's net qualifying capacity after its disconnection, Unit C did not lose its deliverability status until 2020, after Saavi had failed to provide energy in the CAISO markets for three years.[51]

---

[47] *Id.* at 9-10.

[48] *Id.* at 10.

[49] CAISO May 6 Answer at 2-3.

[50] Saavi April 24 Answer at 10.

[51] CAISO May 6 Answer at 4.

34. Third, CAISO asserts that Saavi fails to explain how any "equitable claw back"[52] would work when there is no additional transmission capacity available in that area. CAISO states that all existing deliverability is allocated to online generating resources providing resource adequacy and CAISO cannot simply create additional deliverability, on an interim or permanent basis, by fiat. Thus, according to CAISO, a restoration of Unit C's deliverability would not be equitable and would instead result in significant and lasting reductions in nearby generators' ability to provide resource adequacy.[53]

### D. Saavi May 21, 2024 Answer

35. Saavi contends that it is CAISO, not Saavi, that conflates the concepts of deliverability and net qualifying capacity. Saavi contrasts a December 12, 2023 email in which Bill Weaver, CAISO counsel, states that "Unit C has not had deliverability since 2018 when [CAISO] rightfully removed it from the [net qualifying capacity] list,"[54] with CAISO's representation in its April 9, 2024 answer that Unit C "lost its deliverability status as of 2020 consistent with the CAISO Tariff and Reliability Requirements BPM."[55] According to Saavi, this perceived discrepancy casts doubt on the veracity of CAISO's clarification in its May 6, 2024 answer that Unit C was only removed from the net qualifying capacity list when it disconnected from the CAISO grid but did not lose deliverability until 2020.[56]

36. Saavi also argues that CAISO's references to the limited opportunities for the transfer of deliverability in its May 6, 2024 answer[57] fail to address the alleged unlawful termination of Unit C's full capacity deliverability status. Saavi states that it has reviewed the relevant provisions concerning deliverability transfers and characterizes CAISO's statements on this topic as an attempt to paint Saavi as uninformed and to distract from the issues in the complaint.[58]

---

[52] Saavi April 24 Answer at 10.

[53] CAISO May 6 Answer at 4-6.

[54] Saavi April 24 Answer, Ex. A at 1.

[55] CAISO April 9 Answer at 6.

[56] CAISO May 6 Answer at 4.

[57] *Id.* at 3.

[58] Saavi May 21 Answer at 5.

37. Saavi disputes CAISO's claim that Saavi is attempting to hoard deliverability for theoretical future development.[59] First, Saavi states that the development of the BESS is not theoretical, as evidenced by its communications with CAISO about ongoing progress. Second, Saavi asserts that is not hoarding deliverability but is merely complying with the terms of the PGA with regard to the requirements for disconnecting from CAISO. Saavi contends that, if CAISO were concerned about Saavi or other generators hoarding deliverability, it could have drafted the terms of the PGA differently or could have included language in its disconnect approval letters to Saavi.[60]

38. Saavi also argues that both of CAISO's answers rely heavily on public policy arguments and the administrative burden associated with honoring the terms of the PGA. Saavi asserts that, while reshuffling deliverability to restore Unit C's full capacity deliverability status may present an administrative burden and require CAISO's collaboration with other parties, this is not a compelling reason to excuse CAISO from performing under a longstanding agreement between CAISO and Saavi. Saavi continues to suggest that, given the scarce deliverability in the electrical area of Unit C, an interim solution would be to permit other generators in the area to use Unit C's deliverability on an interim basis when it is not used by Unit C itself.[61]

39. Finally, Saavi contends that CAISO has failed to provide any support for its conclusion that restoring Unit C's deliverability status would require the reduction of deliverability for other nearby generators. Saavi complains that neither it nor the Commission can analyze CAISO's engineering assessment on this issue without access to the relevant information. Thus, Saavi argues that the Commission should afford no weight to CAISO's conclusory analysis.[62]

## IV. Discussion

### A. Procedural Matters

40. Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2023), the timely, unopposed motions to intervene serve to make the entities that filed them parties to this proceeding.

---

[59] CAISO May 6 Answer at 5.

[60] Saavi May 21 Answer at 5-6.

[61] *Id.* at 6-7, 8.

[62] *Id.* at 7-8.

41. Rule 213(a)(2) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.213(a)(2) (2023), prohibits an answer to an answer unless otherwise ordered by the decisional authority. We accept the answers submitted by Saavi and CAISO because they have provided information that assisted us in our decision-making process.

**B. Substantive Matters**

42. We deny the complaint because we find that Saavi has not demonstrated that, in revoking Unit C's full capacity deliverability status, CAISO violated its Tariff or otherwise treated Saavi in an unduly discriminatory manner. The Tariff and the function of deliverability within the overall California resource adequacy framework support a finding that CAISO appropriately revoked Unit C's deliverability rights after a three-year consecutive period of disconnection from the CAISO grid, during which time Saavi remained disassociated from any scheduling coordinator and was, therefore, incapable of operating in the CAISO markets.

43. We find that CAISO's actions here are consistent with the Tariff. Under CAISO's Tariff, a Generating Unit is defined, as relevant here, as an individual generator "connected to the CAISO Controlled Grid" and "capable of producing and delivering net Energy."[63] For the period when it was disconnected from the CAISO grid and not associated with a scheduling coordinator, Unit C was not capable of operating as a Generating Unit because it could not deliver net energy to CAISO's grid under that configuration. We find unpersuasive Saavi's argument that "capable of operating," for purposes of retaining deliverability, means merely that the Generating Unit can produce electric power up to its rated capacity,[64] because this position ignores that, under the Tariff, operating as a Generating Unit includes the ability to deliver the electric power that the Generating Unit produces to the CAISO grid.[65] Without a scheduling coordinator, Unit C could not participate in the CAISO markets and, therefore, necessarily could not deliver net energy to the CAISO grid.

44. Moreover, the Tariff defines deliverability both in terms of a generating resource's net qualifying capacity and the quantity of resource adequacy capacity that a generating resource is eligible to provide. The Tariff defines "Deliverability" in relevant part as the

---

[63] CAISO, CAISO eTariff, app. A (Definitions) (0.0.0) (defining Generating Unit).

[64] *See* Complaint at 10-12.

[65] The Tariff specifies that a Generating Unit, in addition to being capable of producing and delivering net energy, must be either located within or connected to the CAISO balancing authority area. CAISO, CAISO eTariff, app. A (Definitions) (0.0.0) (defining Generating Unit). The logical implication of these requirements is that the energy being produced and delivered is for the benefit of the CAISO grid.

"annual Net Qualifying Capacity of a Generating Facility, as verified through a Deliverability Assessment and measured in MW, which specifies the amount of resource adequacy capacity the Generating Facility is eligible to provide."[66] "Qualifying Capacity" is defined as "[t]he maximum Resource Adequacy Capacity that a Resource Adequacy Resource may be eligible to provide."[67] Further, the Tariff states that "a resource's eligibility to provide Resource Adequacy Capacity may be reduced below its Qualifying Capacity through the CAISO's assessment of Net Qualifying Capacity."[68] Section 40.4.4 of the Tariff details CAISO's obligation to undertake an annual deliverability study to determine the net qualifying capacity of a resource adequacy resource and also states that "in accordance with the procedures specified in the [BPM]," CAISO may reduce the resource's net qualifying capacity to the extent it determines that a generator is not capable of supplying its full qualifying capacity amount.[69]

45. Through the aforementioned Tariff provisions, the Tariff expressly links a resource's deliverability to its eligibility to provide resource adequacy capacity. As such, the question of what it means to be "capable of operating" in the CAISO markets, for purposes of deliverability retention, is best interpreted in a manner that acknowledges the fundamental relationship between deliverability and resource adequacy.[70] Considered in this context, we find that, in order to retain its deliverability, a Generating Unit must be capable of operating in the CAISO markets in a way that supports resource adequacy in the CAISO balancing authority area. For these reasons, we also find that CAISO's actions were consistent with the Tariff. Specifically, when Unit C disconnected from the CAISO grid and disassociated from its scheduling coordinator, CAISO appropriately reduced Unit C's net qualifying capacity to zero and then terminated Unit C's full capacity deliverability status after a continuous three-year period with zero net qualifying capacity. Further, we agree with CAISO that permitting Unit C to retain its deliverability in perpetuity while it was disconnected from the CAISO grid and did not have a scheduling coordinator would undermine the objective of ensuring resource adequacy and

---

[66] CAISO, CAISO eTariff, app. A (Definitions) (0.0.0) (defining Deliverability).

[67] *Id.* (defining Qualifying Capacity).

[68] *Id.*

[69] CAISO, CAISO eTariff, § 40.4.4 (Reductions for Testing) (4.0.0).

[70] *See Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821, 828-29 (D.C. Cir. 2021) ("Whenever possible, the provisions of a tariff should be interpreted harmoniously so as to give effect to all of its provisions and to avoid rendering any provision meaningless.") (internal quotes omitted).

would deprive ratepayers of the benefits of the network upgrades whose costs they bear to ensure deliverable energy.

46. We further find that CAISO's revocation of Unit C's deliverability rights does not violate the provisions of the PGA, including the provisions that set forth the process for Saavi's disconnection from and reconnection to the CAISO grid. The PGA expressly specifies that Unit C "will be subject to the requirements of the CAISO Tariff at all times,"[71] and further obligates Saavi to "comply with all applicable provisions of the CAISO Tariff."[72] The Tariff requires generating units to have a scheduling coordinator in order to conduct any transactions in the CAISO markets.[73] Moreover, the PGA itself expressly notes the scheduling coordinator requirement.[74] Thus, although the PGA provides an option for Unit C to disconnect from and reconnect to the CAISO grid,[75] it does not exempt Saavi from generally applicable Tariff requirements, such as the scheduling coordinator requirement, for remaining eligible to operate in the CAISO markets and/or to continue to provide resource adequacy.

47. Based on these interpretations of the Tariff, we find that CAISO acted consistent with its Tariff in implementing section 6.1.3.4 of the BPM for Reliability Requirements, which states that "[t]o the extent a Generating Unit becomes incapable of operating at this level for any consecutive three-year period, the Generating Unit will lose its deliverability priority . . . ."[76] CAISO's conclusion that when Saavi disconnected from the CAISO grid and disassociated from its scheduling coordinator in 2017, Saavi became incapable of operating in the CAISO markets for purposes of deliverability retention because Unit C was no longer eligible to provide resource adequacy capacity gives effect

[71] PGA, § 4.1.1.

[72] *Id.*, § 4.2.

[73] CAISO, CAISO eTariff, § 4.5.1 (Scheduling Coordinator Certification) (17.0.0) ("Only Scheduling Coordinators that the CAISO has certified as having met the requirements of Section 4.5.1 may participate in the CAISO's Energy and Ancillary Services markets and submit Supply Plans or [Resource Adequacy] Plans."); *id.* § 4.6 Relationship Between CAISO and Generators (9.0.0 0) ("The CAISO shall not accept Bids for any Generating Unit interconnected to the electric grid within the CAISO Balancing Authority Area . . . otherwise than through a Scheduling Coordinator.").

[74] PGA, Clause A.

[75] *Id.*, § 4.1.1.

[76] CAISO, BPM for Reliability Requirements, § 6.1.3.4 (Deliverability to Aggregate of Load).

to the Tariff's definition of deliverability as a measure of how much resource adequacy capacity a generating unit is eligible to provide.[77] CAISO's conclusion also ensures that deliverability is not held back for an unreasonable period of time by resources that cannot meet resource adequacy obligations within CAISO.

48. Under the circumstances presented here, we are not persuaded by Saavi's argument that the rule of reason dictates that the relevant provisions of the BPM for Reliability Requirements must be on file with the Commission prior to being implemented. The rule of reason counsels that, due to the "infinitude of practices affecting rates and services . . . only those practices that affect rates and services significantly, that are realistically susceptible of specification, and that are not so generally understood in any contractual arrangement as to render recitation superfluous" must be in tariffs.[78] Moreover, the U.S. Court of Appeals for the D.C. Circuit has made clear that the Commission has "broad bounds of discretion" in this regard[79] and recently reaffirmed that tariffs do not need to include the *entire universe* of specifiable practices.[80] As we noted above, CAISO's action in establishing section 6.1.3.4 of the BPM for Reliability Requirements is consistent with its Tariff. .[81] Section 40.4.4 of the Tariff details CAISO's obligation to undertake an annual deliverability study to determine the net qualifying capacity of a resource adequacy resource and also states that "in accordance with the procedures specified in the [BPM]," CAISO may reduce the resource's net qualifying capacity to the extent it determines that a generator is not capable of supplying its full qualifying capacity amount.[82] Because the Tariff thus enshrines the principle that a generating resource must meet certain requirements and undergo annual testing to retain its net qualifying capacity (i.e., remain capable of operating at its rated deliverability level for the purpose of retaining deliverability), we find that the remainder of the technical specifications and methodologies at issue here are

---

[77] CAISO, CAISO eTariff, app. A (Definitions) (0.0.0) (defining Deliverability).

[78] *City of Cleveland v. FERC*, 773 F.2d 1368, 1376 (D.C. Cir. 1985).

[79] *Id.* (finding that it is within the Commission's discretion "to give concrete application to [the rule of reason's] amorphous directive").

[80] *Hecate Energy Green Cnty. 3 LLC v. FERC*, 72 F.4th at 1314 (citing *City of Cleveland v. FERC*, 773F.2d at 1376) ("[E]ven specifiable practices that significantly affect rates need not be included if they are clearly implied by the tariff's express terms.").

[81] *Supra* P 47.

[82] CAISO, CAISO eTariff, § 40.4.4 (Reductions for Testing) (4.0.0).

clearly implied by the Tariff's express terms and are appropriately included in the BPM for Reliability Requirements.[83]

49. We find no merit in Saavi's arguments concerning agreements that predate the BPM for Reliability Requirements. As discussed above, CAISO acted consistent with its Tariff in implementing section 6.1.3.4 of the BPM for Reliability Requirements. In addition, the PGA referenced herein was filed with the Commission in 2017, long after the BPM for Reliability Requirements became effective in 2009,[84] and supersedes prior non-conforming participating generator agreements between CAISO and Saavi.[85] Accordingly, Saavi should have been aware that, after a consecutive three-year period of being unable to operate in the CAISO markets, Unit C would lose its deliverability allocation. The fact that Saavi did not understand the applicable deliverability requirements is not a valid basis for holding Saavi harmless for its own failure to comply with those obligations.

50. We are likewise not persuaded by Saavi's claim that CAISO inappropriately terminated Unit C's deliverability prior to the expiration of the three-year period set forth in section 6.1.3.4 of the BPM for Reliability Requirements.[86] As explained by CAISO,[87] the removal of Unit C from the 2018 net qualifying capacity report did not indicate that Unit C's deliverability had been terminated, but only signals that Unit C no longer had any net qualifying capacity because, after it disconnected from the CAISO grid and disassociated from its scheduling coordinator, it was no longer eligible to provide resource adequacy capacity.

51. We find that Saavi's reliance on CAISO's disconnection approval letters[88] is misplaced. As noted by CAISO, these letters reflect CAISO's confirmation of Saavi's election to disconnect from the CAISO grid consistent with the protocols set forth in the

---

[83] *See supra* n.80.

[84] BPM for Reliability Requirements, at 6 (noting an effective date of March 31, 2009).

[85] CAISO, Transmittal Letter, Docket No. ER17-1782-000, at 2 (filed June 9, 2017) (explaining that the PGA supersedes previous non-conforming participating generator agreements between CAISO and Saavi).

[86] Saavi April 24 Answer at 7-8.

[87] CAISO May 6 Answer at 4.

[88] Complaint at 7, Ex. C.

PGA.[89] Nothing in these letters implies that Saavi was exempt from otherwise applicable requirements under the Tariff and, therefore, cannot be interpreted as an affirmation of Unit C's continued deliverability status. To the contrary, CAISO notified Saavi in these letters that Unit C would not be eligible to meet resource adequacy requirements in the CAISO balancing authority area during the period of disconnection.[90]

52. We find no merit in Saavi's argument that CAISO's revocation of Unit C's full capacity deliverability status is unduly discriminatory or inconsistent with CAISO's prior application of deliverability restrictions. Saavi mischaracterizes or misinterprets CAISO's statements in the CPUC proceeding referenced in the complaint as an endorsement of the position that the three-year deliverability retention window does not begin until a generator notifies CAISO of its intent to retire the unit.[91] As CAISO clarifies in its answer, the three-year window is the outer limit for retaining deliverability.[92] In other words, a generator's decision to repower would only be relevant to the question of retaining deliverability *within* the three-year period set forth in section 6.1.3.4 of the BPM for Reliability Requirements. In this case, it has been over six years since Unit C disconnected from the CAISO grid and disassociated from its scheduling coordinator, so it is not relevant that Saavi has not notified CAISO of any intention to retire Unit C. Moreover, this line of argument ignores that CAISO has applied the three-year limitation to other generators when such generators had been ineligible to participate in the CAISO markets for more than three years.[93]

53. Additionally, we find that Unit C's former deliverability allocation cannot be transferred to the planned BESS. First, as a practical matter, Unit C lost its deliverability in July 2020, three years after it disconnected from the CAISO grid and disassociated itself from its scheduling coordinator. Consistent with its Tariff, CAISO accounted for that development and reallocated the deliverability formerly associated with Unit C to other generators in the same electrical area.[94] In essence, therefore, there is no deliverability available to transfer to the BESS.

---

[89] CAISO April 9 Answer at 15-16.

[90] Complaint, Ex. C at 1.

[91] *See* Complaint at 13-14.

[92] CAISO April 9 Answer at 16-17.

[93] *Id.* at 17, Sparks Declaration at 2-4.

[94] *Id.*, Sparks Declaration at 5.

54. Second, we find that Saavi missed the window during which it could have initiated transfer discussions. Section 6.1.3.4 of the BPM for Reliability Requirements establishes that deliverability may be retained after the expiration of the three-year period if, at some point during the three-year period, the generator can demonstrate to CAISO that it is actively engaged in the construction of replacement generation. Here, however, Saavi did not initiate discussions about the planned BESS until summer 2022, almost two full years after the three-year deliverability retention window closed.[95]

The Commission orders:

Saavi's complaint is hereby denied, as discussed in the body of this order.

By the Commission. Commissioner Clements is concurring with a separate statement attached.
Commissioner Rosner is not participating.

( S E A L )

Debbie-Anne A. Reese,
Acting Secretary.

[95] Further, because the three-year retention window has closed and there is no longer any deliverability to transfer to the BESS project, the provisions of the BPM for Generator Management cited by Saavi in the complaint do not dictate a different result here. *See* Complaint at 11-13 (citing CAISO, BPM for Generator Management, §§ 6.5.4 (Deliverability Transfer), 13.1.1 (Fuel Source)).

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Cometa Energia, S.A. de C.V., /o/b/o., Energia Azteca X, S. de R.L. de C.V.
v.

California Independent System Operator Corporation

Docket No. EL24-92-000

(Issued June 27, 2024)

CLEMENTS, Commissioner, *concurring*:

1. Although the Commission reaches the correct result in this case, I write separately to highlight the narrow and fact-specific nature of the rule of reason determination in this order.

2. CAISO's Business Practice Manual (BPM) for Reliability Requirements states that "[t]o the extent a Generating Unit becomes incapable of operating at this level for any consecutive three-year period, the Generating Unit will lose its deliverability priority . . . ."[1] As I explain below, this three-year deadline, which only appears in CAISO's BPM and not in its Tariff, would clearly fail the Commission's rule of reason[2] if considered in isolation.

3. Deliverability is "transmission capacity for a generating facility at a specific point of interconnection to deliver energy to load during peak conditions[.]"[3] It is limited and not

[1] CAISO, BPM for Reliability Requirements, § 6.1.3.4 (Deliverability to Aggregate of Load).

[2] *City of Cleveland v. FERC*, 773 F.2d 1368, 1376 (D.C. Cir. 1985) (interpreting the Federal Power Act to require "only those practices that affect rates and services significantly, that are realistically susceptible of specification, and that are not so generally understood in any contractual arrangement as to render recitation superfluous" to be on file with the Commission) (emphases omitted).

[3] CAISO May 6 Answer at 3.

easily transferable between generators.[4] As Saavi argues, removal of deliverability status "concretely and materially undermines the economic value of the generation facility."[5]

4. It stands to reason that because of the limited nature of deliverability and its corresponding economic value, any deadline that would allow CAISO to revoke a generator's deliverability status permanently would undoubtedly "significantly affect rates, terms, and conditions of service."[6] Indeed, as Saavi points out, CAISO's Tariff *does* include processes to reduce net qualifying capacity.[7] Under the same logic, a specific deadline triggering full termination of a generator's deliverability status would normally warrant inclusion in the Tariff. Had CAISO's BPM provided for a 10-year deadline rather than a three-year deadline, for example, the Commission might not be asked to resolve this complaint at all.

5. Nevertheless, I voted in support of this outcome because CAISO's Tariff, to which Saavi's Participating Generator Agreement must adhere,[8] includes several provisions that, when read together, provide sufficient notice that Saavi could lose deliverability status if it is disconnected for too long.[9] Most importantly, the Tariff provides that CAISO must conduct an annual deliverability assessment and may reduce a resource's net qualifying capacity in response to that study,[10] which could be interpreted to mean that CAISO could revoke a generator's deliverability status after a single year of disconnection. Under that reasoning, the three-year deadline in the BPM merely provides

---

[4] *Id.* at 3, 5.

[5] Saavi April 24 Answer at 5.

[6] *Midcontinent Indep. Sys. Operator, Inc.*, 169 FERC ¶ 61,137, at P 252 (2019); *Demand Response Coalition v. PJM Interconnection*, 143 FERC ¶ 61,061, at P 17 (2013).

[7] Saavi April 24 Answer at 6 (citing CAISO Tariff, § 40.4.2).

[8] Participating Generator Agreement § 4.1.1; § 4.2.

[9] Order PP 43-48 (discussing definitions of Generating Unit, Deliverability, and Qualifying Capacity in CAISO Tariff app. A (Definitions); discussing CAISO Tariff §§ 40.4.4 (Reductions for Testing), 4.5.1 (Scheduling Coordinator Certification), and 4.6 Relationship Between CAISO and Generators)).

[10] CAISO Tariff, § 40.4.4 (requiring CAISO to undertake an annual deliverability study, and explaining that in accordance with the BPM procedures, CAISO may reduce the resource's net qualifying capacity to the extent it determines that a generator is not capable of supplying its full qualifying capacity amount); *see also* Order PP 44, 48.

deadline flexibility to CAISO and generators above and beyond that one year specified in its Tariff. If that were the case, the three-year deadline would be immaterial to the decision in this case and need not be specified in the Tariff.[11]

6. Rule of reason determinations must be addressed on a case-by-case basis, and today's holding is narrowly tailored to these facts. Here, a series of CAISO Tariff provisions, read together, overcome an otherwise clear violation of the rule of reason. Had the Tariff not included these express provisions that imply the existence of such a deadline,[12] I would not have voted in support of this order.

For these reasons, I respectfully concur.

______________________________

Allison Clements
Commissioner

---

[11] Saavi disconnected for approximately seven years and therefore this case is not a close call under the annual deliverability assessment provision of CAISO's Tariff.

[12] *Hecate Energy Green Cnty. 3 LLC v. FERC*, 72 F.4th 1307, 1314 (2023) (citing *City of Cleveland v. FERC*, 773F.2d at 1376) ("[E]ven specifiable practices that significantly affect rates need not be included if they are clearly implied by the tariff's express terms."). Today's order addresses CAISO's tariff provisions together in a way that triggers the Commission's "broad discretion" under *Hecate*. *Id.*

# Attachment B

188 FERC ¶ 62,104
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Cometa Energia, S.A. de C.V., /o/b/o., Energia Azteca X, S. de R.L. de C.V.
v.
California Independent System Operator Corporation

Docket No. EL24-92-001

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND PROVIDING FOR FURTHER CONSIDERATION

(August 29, 2024)

Rehearing has been timely requested of the Commission's order issued on June 27, 2024, in this proceeding. *Cometa Energia, S.A. de C.V. v. Cal. Indep. Sys. Operator Corp.*, 187 FERC ¶ 61,193 (2024). In the absence of Commission action on a request for rehearing within 30 days from the date it is filed, the request for rehearing may be deemed to have been denied. 16 U.S.C. § 825*l*(a); 18 C.F.R. § 385.713 (2023); *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

As provided in 16 U.S.C. § 825*l*(a), the request for rehearing of the above-cited order filed in this proceeding will be addressed in a future order to be issued consistent with the requirements of such section. As also provided in 16 U.S.C. § 825*l*(a), the Commission may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper.

Debbie-Anne A. Reese,
Acting Secretary.